*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITES STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *No. 2:13-cr-04-GZS* |
| | ) | |
| *JOEL DUDLEY,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Joel Dudley, indicted on one count of possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2256(8)(A), *see* Indictment (ECF No. 29), moves to suppress all evidence obtained as a result of an assertedly illegal interrogation on August 20, 2012, *see* Motion To Suppress ("Motion") (ECF No. 40) ¶¶ 3-11, 22.   An evidentiary hearing was held before me on April 5, 2013, during which the defendant appeared with counsel.   The government presented three witnesses and offered one exhibit, which was admitted without objection.   The defendant presented four witnesses, including himself.   After both sides rested, counsel for each argued orally.   I recommend that the following findings of fact be adopted and that the Motion be denied.

## I.   Proposed Findings of Fact

At about noon on August 20, 2012, a team of 12 law enforcement officers arrived at the defendant's apartment in Westbrook, Maine, to execute a search warrant obtained in the course of a child pornography investigation.   Six were police officers, including uniformed officers, detectives, and task force officers, and six were Homeland Security Investigations ("HSI") agents dressed in plainclothes.   All 12 wore ballistic vests, some, if not all, of which identified them as police.   Among the half-dozen HSI agents were special agent David Fife, the lead

1

investigator and case agent in the matter, special agent Martin Conley, whose role that day was to serve as part of the entry team and then to assist Fife in interviews, and Gary Cote, the agent in charge of the Portland, Maine, HSI office, who was the supervisor on the scene.[1]

As Cote and another officer kept watch outdoors, the remaining officers entered the multi-unit apartment building through an unlocked front door and ascended a staircase to the defendant's second-story apartment, their guns drawn and pointed downward in "low ready" position.[2]   One of the officers knocked on the door and announced the officers' presence, knocking more loudly when there was no response.  The defendant's wife, Lori Dudley, then opened the door.  The officer asked whether the defendant was there, and Dudley said that he was not.[3]  The defendant then came into view.  Fred Williams, a Saco, Maine, police officer assigned as a task force officer to HSI, immediately removed him from the premises and brought him to a landing midway down the staircase.  He held the defendant against the wall and frisked him, removing his cell phone pursuant to the warrant.  He then handcuffed the defendant and led him down to the front porch of the building.[4]

As the defendant was being removed from the three-bedroom apartment, the remaining officers split to the left and right to perform a protective sweep.  During that process, which took about 10 or 15 minutes, officers encountered five people in addition to the defendant and his

---

[1] For ease of reference, I sometimes refer to the officers and agents collectively and individually as "officers."

[2] Prior to entry, the team had received information from the Westbrook Police Department that the residents of the apartment included not only the defendant, his wife, their three children, and a roommate, Charal Boothby, but also varying transients, and that the defendant may have had or shown someone a gun.

[3] For ease of reference, I refer to Lori Dudley as "Dudley" and the defendant as "the defendant."

[4] Dudley testified that (i) as her husband walked past her prior to being taken out of the apartment, he told her to call his lawyer, Higgins, a personal friend who works for the "Sanchez law firm" in New York and has helped the family in the past, and (ii) when she went to pick up the phone after her husband was removed from the apartment, an officer told her not to touch it but just to sit and be quiet and not ask questions.  However, she acknowledged on cross-examination that she was never handcuffed or told that she could not leave the apartment with her children. The defendant also testified that he asked his wife to phone Gordon Higgins, who had previously helped the family with a legal issue and worked for the Sanchez law firm.  As discussed below, even crediting their testimony on this point for the sake of argument, it is not outcome-determinative.

wife: three children, a man identified as Robert Duquette, and a woman identified as Charal Boothby.  Duquette was the younger brother of Boothby.  Boothby, who was very close to the Dudley family and had lived with them for about a year, was in the bathroom doing laundry when an officer flung open the bathroom door and ordered her out.  Fife handcuffed Duquette, frisked him, identified him, and removed his handcuffs at the conclusion of the sweep, after which Duquette sat at the kitchen table.[5]  Dudley, Boothby, and the children were not handcuffed, but Dudley and Boothby were told to remain on the living room couch.  The children were in their bedroom at the time of the officers' entry but joined their mother and Boothby in the living room shortly thereafter.[6]  The experience was very upsetting to Dudley, Boothby, and the children, and Boothby began to feel ill.  She took medication and declined an offer by one of the officers to call an ambulance, but he did so anyway.

When officers finished the protective sweep of the apartment, and the search pursuant to the warrant had commenced, Fife headed downstairs, where he found the defendant at the base of the staircase on the first floor of the apartment building with Cote and a Westbrook police officer.  The defendant asked Fife if he could smoke a cigarette, and Fife said that he could.  Fife removed the defendant's handcuffs and explained that officers were there because they had information that someone at that IP address was sharing child pornography through Ares, a peer-to-peer file-sharing program.  He informed the defendant that he was not under arrest but explained that he could not go back to the apartment until the search was complete.  The defendant asked to see the search warrant.  The warrant was in Fife's vehicle, a Ford Explorer

---

[5] Fife testified that the defendant and Duquette were handcuffed during the protective sweep for officer safety, and that officers generally place individuals in handcuffs upon entry until a dwelling is secured.
[6] Dudley testified that she was separated from her children for at least 10 minutes.  However, Boothby testified that, by the time she got to the living room, which took about a minute or a minute and a half, the children were already there.  Nothing turns on the discrepancy.

parked down the street from the apartment building.  Fife returned to the vehicle, drove it to a driveway adjacent to the apartment building, where he parked, and provided the defendant with a copy of the warrant.[7]

At approximately this time, an ambulance arrived.  Paramedics went up to the apartment and escorted Boothby down the stairs, past the defendant.  Boothby was like a mother to the defendant, and he was concerned for her well-being.[8]

Fife asked the defendant if he would be interested in talking to him, and the defendant said without any apparent reservation that he was.  Fife suggested that they talk in Fife's vehicle, which was more private, and the defendant said that would be fine.  Fife asked the defendant to finish his cigarette because the defendant had agreed to speak with him, and he did not want cigarette smoke in his car.

Fife's vehicle is equipped with a police radio and police lights, but the lights are hidden, and it looks like a typical Ford Explorer.  Fife got into the driver's seat of the vehicle, and the defendant got into the front passenger's seat.  Conley, who had by then joined Fife, sat in the backseat behind the defendant.  The vehicle's doors were unlocked, and Fife advised the defendant of that fact and reminded him that he was free to leave.  Fife read the defendant warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), verbatim from a standardized

---

[7] The defendant testified that, upon encountering Fife, he asked him if he could smoke a cigarette, and Fife told him that he would remove the handcuffs if the defendant remained compliant.  Fife denied that he conditioned the removal of the defendant's handcuffs on his remaining good behavior.  He also denied that, at any point during his contact with the defendant that day, he instructed him not to have contact with his wife or anyone else.  I credit Fife's testimony on these points.  It is unlikely that Fife would have taken pains to advise the defendant that he was not under arrest and yet have exerted the degree of control alleged.

[8] There was differing testimony among the hearing witnesses as to exactly when Boothby departed in the company of the paramedics.  However, nothing turns on pinpointing the exact time.  On cross-examination, Boothby admitted that the paramedics did not force her to go to the hospital.  She testified that they encouraged her to go, and she decided to do so.

form.[9]  The defendant agreed to speak with the agents and said that he knew his rights because they had been read to him before.  Fife did not have the defendant sign the form because, in Fife's view, he was not in custody.[10]

Fife and Conley interviewed the defendant for about 40 minutes.  Consistent with Fife's usual practice, he did not record the interview.  Toward the end of the interview, there was a brief interruption when Cote signaled to Fife and Conley that he wanted to speak with them.  Fife told the defendant that they would be right back, and he and Conley stepped outside of the car for an approximately five-minute conversation with Cote.  The defendant remained in the car, although Fife had not instructed him to do so.[11]

Fife described the tone of the interview as fairly cordial.  None of the three participants raised his voice.  Fife's and Conley's holstered weapons would have been visible to the defendant, but at no time did Fife or Conley draw his weapon or display it to the defendant.  At no point during the interview did Conley or Fife touch the defendant or make any kind of

---

[9] Pursuant to *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.  The defendant, Fife, and Conley all testified that Fife read the defendant his *Miranda* rights.

[10] The defendant testified that, when Fife asked him if he was willing to speak with the officers, he told Fife that (i) he would be willing to listen to Fife's explanation about what was transpiring but that he wanted a lawyer, and (ii) Fife responded that he could have a lawyer if he wanted one but that he was not a suspect, and it would look better and be in his best interest if he spoke with the officers.  The defendant further testified that, upon being read his *Miranda* rights, he reiterated that he wanted a lawyer present for any questioning, and Fife again said that it would be in his best interest to speak to the officers.  I do not find this testimony credible.  First, both Fife and Conley testified unequivocally that the defendant never requested an attorney or asked that their interview of him stop.  Second, Conley testified that the defendant never said anything about an attorney, even that he might want to talk to one.  Third, the defendant admitted on cross-examination that (i) he knew his *Miranda* rights prior to his encounter that day with officers, (ii) he knew enough to ask to see the search warrant, (iii) upon his arrest later that day, he accused the officers of arresting him without probable cause and threatened to sue them, and (iv) he was "quite protective" of his rights.  Against this backdrop, I deem it unlikely that the defendant would have proceeded to answer the officers' questions had he invoked his right to an attorney.

[11] Conley and Cote both testified that they did not recall a break in the interview during which Fife and Conley spoke to Cote.  Cote testified that the conversation occurred after the interview ended.  However, both Fife and the defendant testified that such a break occurred.  I have credited Fife's and the defendant's testimony on this point, although nothing turns on it.

physical contact with him.  At no time during the interview did the defendant ask to speak with an attorney or request that the interview be stopped.

At the conclusion of the interview, Fife reiterated to the defendant that he could not return to the apartment until the search was finished, but did not otherwise restrict his movement. The defendant remained unhandcuffed.  Fife went back to the apartment, where the search was ongoing, and left the defendant sitting outside on the front stoop near Cote and a couple of other officers.  Fife and Conley interviewed Duquette in Fife's vehicle, after which Duquette joined the defendant on the stoop.  Officers did not try to prevent the two from interacting.  After officers found a CD containing child pornography, Fife asked the defendant, who was still on the front stoop, whether the items on his desk belonged to him.   The defendant answered the question.

During the interval between the defendant's interview and the conclusion of the search, the defendant asked to get something to drink and to use the bathroom.  An officer escorted him back to his apartment as Cote followed.  Dudley, who was seated at the kitchen table, asked the defendant why the search warrant was being executed and what was going on.  The defendant handed her the copy of the warrant.[12]  While the defendant used the bathroom, the door was kept fully open, and Cote stood by the door.[13]  Cote obtained two cans of Mountain Dew for the defendant and Duquette, and returned to the front stoop with the defendant.

At some point during the time that the defendant was on the front stoop, his mother, Cheryl Dearborn, a taxi driver, drove by in her green taxi and parked near the apartment

---

[12] Dudley testified that an officer grabbed the search warrant out of her hand immediately and told her that she did not need to see it.  However, Cote, who was in the room at the time, did not recall anyone taking the warrant from Dudley.  I find his testimony more credible than hers on this point.
[13] Cote testified that this is consistent with HSI's typical practice during the execution of a search warrant and is done for safety reasons.

building, intending to talk to her son and visit her grandchildren, as was her habit on ending her taxi driving shift.  Before she could turn off her engine, a uniformed officer approached her, told her the defendant was busy with the officers, and asked her to leave.  She drove away without speaking to her son.

At about 3 p.m., after the search concluded, Fife advised the defendant that he was under arrest and handcuffed him.  During the arrest and the transport of the defendant to the Cumberland County Jail, he became increasingly agitated, threatening to sue the officers and repeatedly asking what probable cause they had to place him under arrest.

## II.  Discussion

The defendant seeks to suppress all evidence obtained as a result of his assertedly illegal interrogation by Fife and Conley on August 20, 2012.  *See* Motion at 5.  Specifically, he contends that his rights were violated when, while he was in custody, the agents continued to interrogate him after he invoked his Fifth Amendment rights to counsel and to remain silent.  *See id.* at 3-5.  The government counters that the defendant was not in custody but that, even assuming *arguendo* that he was, he knowingly and voluntarily waived his *Miranda* rights, including his right to an attorney, and made voluntary statements.  *See* Government's Opposition to Defendant's Motion To Suppress ("Opposition") (ECF No. 42) at 6-10.

The government bears the burden of proving the voluntariness of a confession, *see, e.g., United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990), as well as compliance with the dictates of *Miranda*, *see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), which include the directive that, following a suspect's unambiguous invocation of the right to an attorney, police must cease questioning him or her until an attorney is present, *see, e.g., United States v. Olsen*, 609 F. Supp. 1154, 1158 (D. Me. 1985).

7

For the reasons that follow, I conclude that, assuming *arguendo* that the defendant was in custody, he voluntarily waived his *Miranda* rights and voluntarily made statements to Fife and Conley, at no time asking that questioning stop or invoking his right to counsel.  Accordingly, I recommend that the Motion be denied.

### A.  Whether Defendant Invoked His Right to Counsel

In *Edwards v. Arizona,* 451 U.S. 477 (1981), the Supreme Court held that law enforcement officers must immediately cease questioning of a suspect who clearly asserts his or her right to have counsel present during interrogation.  *See Edwards*, 451 U.S. at 484-85.  *See also, e.g.*, *United States v. Libby*, No. CRIM. 04-26-B-W, 2004 WL 1701042, at *6 (D. Me. July 30, 2004) (rec. dec., *aff'd* Sept. 27, 2004) ("If a defendant subjected to custodial interrogation unequivocally invokes his right to counsel, all questioning must cease.  To activate the prohibition on continued questioning, however, the request for counsel must be unambiguous.") (citations omitted).

The government contends that, even assuming that the defendant was in custody, he knowingly and voluntarily waived his *Miranda* rights, including his right to counsel.  *See* Opposition at 9.  Its argument is persuasive.

 Even assuming *arguendo* that, before he was taken from the apartment, the defendant asked his wife to contact his attorney, there is no evidence that any law enforcement officer overheard that request.  Any such request, thus, was not in itself an unambiguous invocation of his right to counsel.  Nor do I find that, if he made such a request of his wife, it lends support to his testimony that he later invoked his right to counsel in the presence of Conley and Fife.

There is no dispute that Fife read the defendant his *Miranda* rights and that the defendant understood those rights even prior to his encounter with officers on August 20, 2012.  I have

recommended that the court find as facts that the defendant agreed to speak with officers despite knowing those rights and did not at any time invoke his right to counsel to either Fife or Conley. As noted above, his testimony that he did invoke that right in the officers' presence is not credible.  First, both Fife and Conley testified unequivocally that the defendant never requested an attorney or asked that their interview of him stop.  Second, Conley testified that the defendant never said anything about an attorney, even that he might want to talk to one.  Third, the defendant admitted on cross-examination that (i) he knew his *Miranda* rights prior to his encounter that day with officers, (ii) he knew enough to ask to see the search warrant, (iii) upon his arrest later that day, he accused the officers of arresting him without probable cause and threatened to sue them, and (iv) he was "quite protective" of his rights.  In these circumstances, the defendant likely would have invoked his right to counsel, and ceased answering officers' questions, if he did not wish the interview to continue.  He instead continued answering their questions, no doubt because he perceived an advantage, or at least no harm, in doing so.

The defendant, thus, never made an unambiguous invocation of his right to counsel.

### B.  Whether Defendant's Statements Were Voluntary

Involuntary confessions violate the due-process clauses of the Fifth and Fourteenth amendments.  *See, e.g., United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002).  In the face of a defendant's claim that his or her confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore his or her will.  *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'"  *Colorado v. Connelly,* 479 U.S. 157, 167 (1986).  *See also, e.g., Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) ("A confession or other admission is not

deemed coerced or involuntary merely because it would not have been made had the defendant not been mentally defective or deranged.  The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

The defendant has not claimed that any statements that he made on August 20, 2012, were extracted involuntarily.  *See generally* Motion; Defendant's Reply to Government's Opposition to Motion To Suppress (ECF No. 44).  In any event, the evidence indicates that they were not.  During his 40-minute conversation with Fife and Conley in Fife's vehicle and his brief conversation with Fife following the discovery of a CD containing child pornography, Fife and Conley conversed with him in normal conversational tones, did not lay a hand on him, and never pointed their weapons at him.  The defendant was familiar with, and protective of, his rights. Fife asked if he was willing to speak with officers, and he agreed, presumably because he judged that doing so would be advantageous.  Indeed, one fairly can infer that he did not anticipate that either the search or his statements would lead to his arrest: upon the happening of that event, he became angry, told officers that they had no probable cause, and threatened to sue them.

### III.  Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress be **DENIED**.

### NOTICE

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 26th day of April, 2013.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge